OWEN, Circuit Judge,
concurring and dissenting.
I would hold that only two narrow provisions of the Ordinance[1] are preempted by federal law. They are within the judicial review sections of the Ordinance.[2] One subsection, (E)(4), and one sentence in subsection (E)(5) are in conflict with federal immigration law. I would sever these provisions and hold that the remainder of the Ordinance is not preempted by federal law.
I
I agree with the dissenting opinion authored by Judges Jones and Elrod that the Ordinance is not preempted by the Constitution’s broad grant to the federal government of the power to regulate immigration.[3] The Ordinance does not determine “who should or should not be admitted into the country” or “the conditions *550 under which a legal entrant my remain.”[4] As the Supreme Court explained in De Canas v. Bica,[5] it would have been unnecessary, in decisions of the Court that preceded De Canas, “even to discuss the relevant congressional enactments in finding pre-emption of state regulation if all state regulation of aliens was ipso facto regulation of immigration, for the existence vel non of federal regulation is wholly irrelevant if the Constitution of its own force requires pre-emption of such state regulation.” [6]
As to field preemption, I largely agree with Judge Higginson’s specially concurring opinion that there is no field preemption of the Ordinance. Congressional regulation of “ ‘the nature of the ... subject matter,’ ” which in this case is the availability of rental housing to unlawfully present aliens, is not so extensive that it “ ‘permits no other conclusion’ ” than preemption.[7] Nor has Congress “unmistakably so ordained” such that field preemption is required.[8]
Other parts of the Ordinance are preempted, if at all, if there is a conflict with federal law either because “ ‘compliance with both federal and state regulations is a physical impossibility,’ ” which is not the case here, or the “state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ”[9] We are admonished by the Supreme Court that “ ‘[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.’ ”[10] We must also be mindful that “[i]n preemption analysis, courts should assume that ‘the historic police powers of the States’ are not superseded ‘unless that was the clear and manifest purpose of Congress.’ ”[11] The regulation of leasing and renting real property is within the historic police powers of the States. As noted, however, certain provisions in the judicial review sections in the Ordinance conflict with federal immigration law.
II
The Ordinance has provisions in section 1 that apply to leasing or renting single-family housing and virtually identical provisions in section 3 that apply to apartment complex rentals. Section 1 of the Ordinance amended Section 26-79 of the Code of Ordinances of the City of Farmers Branch, and section 3 of the Ordinance amended section 26-119. For ease of reference, I refer to both sections 1 and 3 in discussing “the Ordinance,” unless otherwise indicated. I first consider provisions of the Ordinance that create an offense applicable to — or that impose obligations upon — an individual.
A
Subsection (B)(1) requires each occupant, prior to occupying leased or rented property, to obtain a residential occupancy *551 license.[12] It is an offense, under subsection (C)(1), if a person occupies leased or rental property without first obtaining a valid occupancy license.[13] These provisions apply both to citizens of the United States and to non-citizens. The question is whether these provisions are preempted by federal law to the extent they apply to aliens who are not lawfully present in the United States.
To obtain an occupancy license under the Ordinance, a person must submit an application that contains one of the following:
(1) a statement that applicant is a United States citizen or national;
(2) if the applicant is not a citizen or national, a federal government identification number that the applicant believes establishes lawful presence in the United States;

or

(3) if the applicant does not know of a federal identification number, a declaration that he or she does not know of such a number.[14]
The Ordinance explicitly provides that a declaration that an applicant “does not know of any such number ... shall be sufficient to satisfy this requirement.”[15]
This means that if a person is unlawfully present in the United States, she may truthfully declare that she does not know of any federal identification number that she believes establishes her lawful presence in the United States. If an application contains such a declaration, the building inspector “shall immediately issue a residential occupancy license.” [16] The Ordinance continues in the next sentence: “[t]he building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee,”[17] making it unmistakably clear that a declaration that a prospective tenant knows of no federal identification number that establishes lawful presence in the United States is not a bar to receiving an occupancy license. Accordingly, a person unlawfully present in the United States may obtain an occupan *552 cy license by truthfully disclosing that she knows of no federal documentation that would permit her lawful presence in this country.
After issuing a license to someone who has not declared herself to be a citizen or national of the United States, the Ordinance directs the building inspector to avail herself of 8 U.S.C. § 1373(c)[18] to “verify with the federal government whether the occupant is an alien lawfully present in the United States.”[19] It is only if the federal government reports that the occupant is an alien not “lawfully present” in the United States that there is a consequence to the alien. That consequence is revocation of the occupancy license.[20] As a practical matter, this is designed to lead the landlord to evict an unlawfully present alien from the premises because of the provisions of the Ordinance that are aimed at the landlord.[21]
The appellees characterize the Ordinance as “an alien registration scheme” in an effort to shoehorn it into the Supreme Court’s statement in Arizona v. United States that “the Federal Government has occupied the field of alien registration.”[22] The state law found to be field preempted in Arizona penalized as a misdemeanor the “ ‘willful failure to complete or carry an alien registration document ... in violation of [8 U.S.C. § 1304(e) or 1306(a) ].’ ”[23] The Farmers Branch Ordinance does not penalize the failure to register or to carry documentation. It revokes an occupancy license because of the status of an alien as unlawfully present in the United States. If the Appellees’ argument were accepted, no state or local government could refuse to grant permits or licenses to someone unlawfully present in the United States. The denial or revocation of a permit would be deemed an “alien registration scheme” simply because it would affect those who could not obtain federal documentation reflecting a lawful right to be present in the United States. The Court’s reasoning in Arizona cannot be stretched this far. To the contrary, the Court’s decision in Arizona supports the conclusion that unless and until Congress comprehensively regulates the housing of aliens, “a State ha[s] authority to pass its own laws on the subject.” [24]
One of the state laws at issue in Arizona made it a misdemeanor for “ ‘an unauthorized alien to knowingly apply for work.’ ”[25] The Court made clear that “[w]hen there was no comprehensive federal program regulating the employment of unauthorized aliens, this Court found that a State had authority to pass its own laws on the subject.”[26] Citing its decision *553 in De Canas, the Court explained that at a time when “the Federal Government had expressed no more than ‘a peripheral concern with [the] employment of illegal entrants,’ ” a state could impose “civil penalties on the employment of aliens who were ‘not entitled to lawful residence in the United States.’ ”[27] The current state of the federal law governing the housing of aliens is indistinguishable from the state of the law governing the employment of aliens at the time that De Canas was decided. The federal government has expressed “no more than ‘a peripheral concern’ ”[28] with the availability of housing to aliens.
After De Canas was decided, Congress enacted the Immigration Reform and Control Act of 1986 (IRCA)[29] “as a comprehensive framework for ‘combating the employment of illegal aliens.’ ”[30] In Arizona, the Court examined the substance of this enactment, cataloguing the civil penalties imposed under federal law, including removal of the alien, for engaging in unauthorized employment and noting the criminal penalty for obtaining employment through fraudulent means.[31] The Court concluded that “Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment.”[32] It was only because of the comprehensive nature of the federal scheme and Congress’s intentional decision not to make it a crime for aliens to seek or engage in unauthorized employment[33] that the Court concluded that the Arizona statute both conflicted with the method of enforcement of the federal law and stood as “an obstacle to the regulatory system Congress chose.”[34]
By contrast, Congress has regulated narrowly in the area of aliens obtaining housing, and where it has regulated, its intent and purposes are not inconsistent with, and certainly do not foreclose, local government regulation like the Ordinance. Federal law provides that most, if not all, aliens who are unlawfully present in the United States are not eligible for any State or local public benefit — including public or assisted housing — that is provided by State- or local-government-appropriated funding, unless a State affirmatively so provides by enacting a state law.[35] Federal law also provides, subject to certain narrow exceptions, that the States have authority to limit eligibility of aliens who are lawfully present in the United States for State public benefits, including public or assisted housing.[36]
*554 Congress has not comprehensively regulated housing for aliens. There is no field preemption. The States remain free to regulate in this area.
B
If an applicant for an occupancy license is not a United States citizen or national, she may provide a federal identification number that she believes establishes her lawful presence in the United States.[37] Subsection (C)(2) provides that “[i]t shall be an offense for a person to knowingly make a false statement of fact on an application for a residential occupancy license.” [38] It is similarly an offense under the Ordinance if a person knowingly makes a false statement that she is or has been a United States citizen or national.[39] An offense under the Ordinance is punishable by a fine not to exceed $500.[40] No party challenges these sections of the Ordinance.
C
The Ordinance also provides in (C)(3) that it is an offense “to create, possess, sell, or distribute a counterfeit residential occupancy license.”[41] None of the parties challenges this provision of the Ordinance. It is not preempted by any provision of federal law. It pertains only to local occupancy licenses.
Ill
The Ordinance has various provisions that apply to landlords or lessors, as distinguished from tenants or lessees. A lessor must notify prospective lessees of the occupancy license requirements.[42] This provision is not the focus of the present controversy, and in any event, it does not directly implicate federal immigration regulation. The more contentious provisions of the Ordinance are designed to facilitate the termination of leases-to aliens who are unlawfully present in the United States.
It is an offense if a landlord rents to a tenant without obtaining a copy of an occupancy license.[43] It is an offense if the terms of the lease agreement fail to specify that occupying the premises without a license is an event of default.[44] It is similarly an offense for a lessor to permit someone to occupy the premises without a valid license, although the lessor has a defense if she attempted to terminate the lease.[45] Each of these offenses is punishable by a fine of up to $500 each day that a violation occurs or continues.[46] If a lessor *555 knowingly permits occupancy without a valid license, the lessor’s rental license will also be suspended.[47]
None of these provisions are preempted by federal law for the same reasons, discussed above, that the Ordinance’s provisions aimed at tenants or lessees who are unlawfully present in the United States are not preempted. Congress has not comprehensively regulated housing for aliens. The Supreme Court’s decision in De Canas controls, unless and until Congress acts in this area.
IV
The appellees contend that federal law regarding harboring of unlawfully present aliens[48] preempts the Ordinance to the extent that the Ordinance creates an offense for landlords who “knowingly permit an occupant to occupy a single family residence without a valid residential occupancy license” or requires landlords to terminate leases when an unlawfully present alien’s occupancy license has been revoked. However, there is no field preemption regarding housing for unlawful aliens, and therefore, the Ordinance under consideration differs from the state laws found preempted in Arizona.[49] The Supreme Court held in Arizona that a state law that “add[ed] a state-law penalty for conduct proscribed by federal law” was preempted, not because states are prohibited from enacting criminal laws that impose different penalties than federal law for the same conduct, but because “the Federal Government has occupied the field of alien registration.”[50] There was field preemption. The Supreme Court emphasized that “[w]here Congress occupies an entire field, as it has in the field of alien registration, even complimentary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards.”[51] In such circumstances, “[p]ermitting the State to impose its own penalties for the federal offenses ... would conflict with the careful framework Congress adopted.”[52]
I respectfully submit that the Supreme Court unequivocally held in De Canas that the federal harboring laws do not give rise to field preemption. In De Canas, the federal harboring law in existence at the time expressly provided that “‘employment (including the usual and normal practices incidental to employment) shall not be deemed to constitute harboring.’ ”[53] But a California law criminalized knowingly employing an unlawfully present alien if that employment would have an adverse effect on lawful resident workers.[54] If the federal harboring statute occupied either the field of harboring aliens or the field of employing aliens, then a state would not have been permitted to legislate at all in these areas,[55] and certainly, a state would not be permitted to criminalize conduct *556 that the federal law explicitly said was not an offense. The Supreme Court squarely held that the federal harboring laws did not give rise to field preemption and therefore that the California law was not preempted, even though it was contrary to federal law.[56]
The contention is made that the Ordinance is conflict preempted because it “ ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress’ ”[57] with regard to the federal harboring laws. It is true that Congress has expressed its intent that the federal government is to be the exclusive decision maker as to whether someone harboring aliens should be prosecuted. However, the Ordinance is not aimed at that conduct. The Ordinance exacts a penalty for continuing to lease property to a person whom the lessor knows no longer has a valid occupancy license. The lessor commits an offense only after (1) federal authorities have determined, not once but twice, that the occupant of the leased premises is not lawfully present in the United States;[58] (2) the occupant and the lessor have been given notice that the resident’s occupancy license will be revoked effective 15 days after the date of the revocation notice;[59] and (3) if the lessor thereafter takes no action to terminate the lease.[60] Additionally, it is a defense to prosecution if the lessor has diligently pursued steps under applicable law and the lease provisions to terminate the lease.[61]
While there is, arguably, limited overlap between the federal offense of harboring an alien and the Ordinance, the elements of the federal and local offenses are quite distinct. So is the “evil” sought to be addressed by the respective laws. The federal harboring statute is aimed at prohibiting the secreting of individuals unlawfully present in the United States. The Ordinance is aimed at terminating lease agreements and doing so only after a lengthy public process in which the federal government has made a determination, twice, that the occupant was unlawfully present.[62] The Ordinance requires a local government official to bring the fact of an individual occupant’s potentially unlawfully-present status to the attention of the federal government.[63] There is no “secreting” of an alien by the lessor because of the notifications to the federal government required by the Ordinance. It is not knowingly secreting or harboring that is the actus rea of the Ordinance. The actus rea is the failure to terminate a lease once notice has been sent by a local government *557 official that an occupancy license is no longer valid.[64] The lessor is not required by the Ordinance to terminate the unlawful alien’s lease unless and until the federal government has twice advised a local government official, pursuant to a federal statute,[65] that the occupant is unlawfully present in the United States.[66]
The Ordinance contemplates that a lessor may gain knowledge that an occupant is unlawfully present in the United States and may nevertheless permit the alien to remain in the leased premises until the local government process is concluded and it is finally determined, within the potentially lengthy processes set forth in the Ordinance, that the alien is unlawfully present.[67] The federal harboring statute, by contrast, would arguably be violated once the lessor gains actual knowledge that the alien is unlawfully present and continues to permit the alien to occupy the leased premises.
The Ordinance does not stand as an obstacle to the accomplishment and execution of the full congressional purposes and objectives in enacting the harboring laws. The harboring laws encompass and proscribe conduct that is far broader than the Ordinance. The federal harboring laws and the Ordinance may be enforced simultaneously. Additionally, as noted earlier, federal law provides that most, if not all, aliens who are unlawfully present in the United States are not eligible for any State or local public benefit, including public or assisted housing, that is provided by State- or local-government-appropriated funding unless a State affirmatively so provides by enacting a state law. Federal law even allows States to deny State public-housing benefits to certain aliens who are lawfully present in the United States.[68] Requiring private lessors and landlords to terminate leases when a determination has been made by the federal government that the occupant is unlawfully present in the United States is not in tension with this federally expressed policy.
V
The argument is made that if all or a substantial number of states or local governments had laws similar to the Ordinance, then unlawfully present aliens whom the federal government had decided not to deport or remove would be unable to find housing. This, the appellees contend, would interfere with federal decisions about who is entitled to remain in the United States. Alternatively, it is asserted that there is conflict preemption.
The field preemption issue is once again resolved by De Canas. The fact that the federal government undeniably has the exclusive power to determine questions of removal and deportation does not give rise to field preemption of all state regulation that touches upon immigration. “The comprehensiveness of the INA scheme for regulation of immigration and naturalization, without more, cannot be said to draw in the employment of illegal aliens as ‘plainly within ... [that] central aim of federal regulation.’”[69] Just as there was *558 no “more” regarding employment of illegal aliens at the time De Canas was decided, there is presently no “more” regarding housing of unlawfully present aliens.
For the same reasons that the Ordinance is not conflict preempted by the federal harboring laws, the Ordinance is not conflict preempted by the authority of the federal government to determine whether an unlawfully present alien may remain in the United States. There is even less of a potential conflict between the Ordinance and the general grant of immigration authority to the federal government than there is a potential conflict with the harboring laws.
VI
Judge Higginson’s opinion discusses at some length whether federal authorities would be able to advise the Farmers Branch building inspector if an individual alien was “unlawfully present” in the United States.[70] With great respect, this has nothing whatsoever to do with whether the Ordinance is conflict-preempted. If the federal government, in response to an inquiry under 8 U.S.C. § 1373(c), will not or cannot advise the building inspector as to whether an alien is lawfully present, that is the end of the matter. The Ordinance expressly directs that “the building inspector shall take no further action until final verification from the federal government concerning the immigration status of the occupant is received.”[71] The Ordinance could not be clearer that the building inspector has no authority to make a determination of whether an occupant is lawfully or unlawfully present: “[t]he building inspector shall not attempt to make an independent determination of any occupant’s lawful or unlawful presence in the United States.”[72]
If the federal government responds to the Farmers Branch building inspector that an alien is unlawfully present in the United States, then there is no conflict with any federal law. The only consequence to the alien is the eventual termination of her lease by the lessor or landlord. There is no fine. There is no criminal offense. The lessor or landlord may commit an offense if it takes no steps to terminate the alien’s lease, but for the reasons already considered, that is not in conflict with federal law.
It is highly improbable that under Texas law, a lessor or landlord would be arrested for committing such an offense, since it is unlikely that an offense would occur within plain view of an officer.[73] But even were that to occur, a state-law provision allowing arrest of a landlord or lessor is not equivalent to allowing arrest or detention of an alien. The Supreme Court’s decision in Arizona dealt with a state law allowing arrest of an alien.[74]
VII
The judicial review provisions of the Ordinance are problematic to some degree, though I disagree with Judge Higginson’s opinion that all of the judicial review section is preempted. Subsection (E)(3) provides that a state court is to determine “whether the occupant is lawfully present in the United States.”[75] This section *559 would not conflict with federal law if the determination of the “lawfully present” status was limited to looking to the information provided by the federal government under 8 U.S.C. § 1373(c).
Subsection (E)(4), however, injects considerable uncertainty into the judicial review provisions. It provides that the question of whether an occupant is lawfully present in the United States “shall be determined under federal law.”[76] Giving these words their natural construction might mean that a reviewing court is free to make its own determination of whether an alien is “lawfully present” by examining federal immigration law. Clearly, only the federal government may make a determination as to whether to admit, exclude, or remove an alien.[77] The next sentence in subsection (E)(4) further clouds the process that is to occur during judicial review. It says, “[i]n answering the question [of whether the occupant is lawfully present in the United States], the court shall be bound by any conclusive determination of immigration status by the federal government.”[78] This sentence implies that if there is no conclusive determination of immigration status by the federal government, then the state court is to determine that status by applying federal law. This would be in direct conflict with the federal immigration scheme, which leaves no room for a determination of immigration status other than through the immigration proceedings set forth under federal law.
Subsection (E)(5) provides that the state court shall take judicial notice of any immigration status previously provided by the federal government and that the state court may, and shall upon request of a party, request the federal government to provide “a new verification of the citizenship or immigration status of the occupant.” [79] These provisions do not conflict in any way with federal law. However, subsection (E)(5) then provides that “[t]he most recent determination of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual’s immigration status.”[80] This leaves room for a state court to substitute its own determination of immigration status, since the federal government’s most recent determination is entitled only to a “rebuttable presumption.” [81]
I would hold that subsection (E)(4) and the final sentence of subsection (E)(5) are preempted. However, the Ordinance contains a severability clause,[82] and under *560 Texas law, that clause would doubtless be given effect.[83] I agree with the analysis and discussion of severability in the dissenting opinion of Judges Jones and Elrod.
* * *
I respectfully concur in the court’s judgment in part and dissent in part, as indicated above.

. City of Farmers Branch, Tex., Ordinance 2952 (Jan. 22, 2008), permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex., 701 F.Supp.2d 835, 859 (N.D.Tex.2010).

. Id. § 1 (to be codified at Ordinances § 26-79(E)); id. § 3 (to be codified at Ordinances § 26-119(E)).

. See, e.g., De Canas v. Bica, 424 U.S. 351, 354, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

. Id. at 355, 96 S.Ct. 933.

. 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976).

. Id. at 355, 96 S.Ct. 933.

. Id. at 356, 96 S.Ct. 933 (quoting Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)).

. Id. (internal quotation marks omitted).

. Arizona v. United States,-U.S.-, 132 S.Ct. 2492, 2501, 183 L.Ed.2d 351 (2012) (quoting Fla. Lime, 373 U.S. at 142, 83 S.Ct. 1210; Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

. Id. (quoting Crosby v. Nat’l Foreign Trade Council, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)).

. Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

. City of Farmers Branch, Tex., Ordinance 2952, § 1 (Jan. 22, 2008) (to be codified at City of Farmers Branch, Tex, Code of Ordinances § 26-79(B)(l) (2011)), permanently enjoined by Villas at Parkside Partners v. City of Fanners Branch, Tex., 701 F.Supp.2d 835, 859 (N.D.Tex.2010); id. § 3 (to be codified at Ordinances § 26-119(B)(1)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(1)); id. § 3 (to be codified at Ordinances § 26-119(0(1)).

. See id. § 1 (to be codified at Ordinances § 26 — 79(B)(5)(h),(i)); id. § 3 (to be codified at Ordinances § 26-119(B)(5)(h), (i)). Each section provides in pertinent part:
The form shall require the following information:
(h) if the applicant is a United States citizen or national, a signed declaration that the applicant is a United States citizen or national; ...
-or-
(i) if the applicant is not a United States citizen or national, an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the United States (examples include, but are not limited to: resident alien card number, visa number, "A” number, 1-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government). If the applicant does not know of any such number, he or she shall so declare. Such a declaration shall be sufficient to satisfy this requirement.

. Id. § 1 (to be codified at Ordinances § 26-79(B)(5)(i)); id. § 3 (to be codified at Ordinances § 26-119(B)(5)(i)).

. Id. § 1 (to be codified at Ordinances § 26-79(B)(6)); id. § 3 (to be codified at Ordinances § 26-119(B)(6)).

. Id.

. 8 U.S.C. § 1373(c) provides:
(c) Obligation to respond to inquiries The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

. Ordinance 2952, § 1 (to be codified at Ordinances § 26-79(D)(l)); id. § 3 (to be codified at Ordinances § 26-119(D)(1)).

. Id. § 1 (to be codified at Ordinances § 26-79(D)(4)); id. § 3 (to be codified at Ordinances § 26-119(D)(4)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(6) — (7)); id. § 3 (to be codified at Ordinances § 26 — 119(C)(6)—(7)).

. - U.S. -, 132 S.Ct. 2492, 2502, 183 L.Ed.2d 351 (2012).

. Id. at 2501.

. Id. at 2503.

. Id.

. Id.

. Id.

. Id. (quoting De Canas v. Bica, 424 U.S. 351, 360, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)).

. Pub.L. No. 99-603, 100 Stat. 3359 (codified in scattered sections of 8 U.S.C.).

. Arizona v. United States,-U.S.-, 132 S.Ct. 2492, 2504, 183 L.Ed.2d 351 (2012) (quoting Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002)).

. Id.

. Id.

. Id. at 2505 ("The correct instruction to draw from the text, structure, and history of IRCA is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment. It follows that a state law to the contrary is an obstacle to the regulatory system Congress chose.”); id. (" ‘Where a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn — not from federal inaction alone, but from inaction joined with action.’ ” (quoting P.R. Dep’t of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988))).

. Id.

. 8U.S.C. § 1621.

. Id. §§ 1621(c)(1)(B), 1622(a).

. City of Farmers Branch, Tex., Ordinance 2952, § 1 (Jan. 22, 2008) (to be codified at City of Farmers Branch, Tex., Code of Ordinances § 26-79(B)(5)(i) (2011)), permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex., 701 F.Supp.2d 835, 859 (N.D.Tex.2010); id. § 3 (to be codified at Ordinances § 26 — 119(B)(5)(i)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(2)); id. § 3 (to be codified at Ordinances § 26-119(0(2)).

. Ordinance 2952, § 1 (to be codified at Ordinances § 26-79(B)(5)(h), (C)(2)); id. § 3 (to be codified at Ordinances § 26-119(B)(5)(h), (C)(2)).

. Id. § 5.

. Ordinance 2952, § 1 (to be codified at Ordinances § 26-79(0(3)); id. § 3 (to be codified at Ordinances § 26-119(C)(3)).

. Id. § 1 (to be codified at Ordinances § 26-79(B)(3)); id. § 3 (to be codified at Ordinances § 26-119(B)(3)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(4)); id. § 3 (to be codified at Ordinances § 26-119(0(4)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(6)); id. § 3 (to be codified at Ordinances § 26-119(0(6)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(7)); id. § 3 (to be codified at Ordinances § 26-119(0(7)).

. Id. § 5.

. Id. § 1 (to be codified at Ordinances § 26-79(D)(5)); id. § 3 (to be codified at Ordinances § 26-119(D)(5)).

. 8 U.S.C. § 1324.

. Arizona v. United States,-U.S.-, 132 S.Ct. 2492, 2501-03, 183 L.Ed.2d 351 (2012).

. Id. at 2502.

. Id. (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 249, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)).

. Id.

. De Canas v. Bica, 424 U.S. 351, 361, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (quoting 8 U.S.C. § 1324(a) (1976) (amended 1986)).

. Id. at 352, 96 S.Ct. 933.

. Arizona, 132 S.Ct. at 2502 (“Where Congress occupies an entire field, as it has in the field of alien registration, even complimentary state regulation is impermissible.”).

. De Canas, 424 U.S. at 360-61, 96 S.Ct. 933.

. Arizona, 132 S.Ct. at 2501 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

. City of Farmers Branch, Tex., Ordinance 2952, § 1 (Jan. 22, 2008) (to be codified at City of Farmers Branch, Tex., Code of Ordinances § 26-79(D)(2), (4) (2011)), permanently enjoined by Villas at Parkside Partners v. City of Farmers Branch, Tex., 701 F.Supp.2d 835, 859 (N.D.Tex.2010); id. § 3 (to be codified at Ordinances § 26-119(D)(2), (4)).

. Id. § 1 (to be codified at Ordinances § 26-79(D)(4)); id. § 3 (to be codified at Ordinances § 26-119(D)(4)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(7)); id. § 3 (to be codified at Ordinances § 26-119(0(7)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(7)); id. § 3 (to be codified at Ordinances § 26-119(0(7)).

. See id. § 1 (to be codified at Ordinances § 26-79(0(7), (D)(l)-(5)); id. § 3 (to be codified at Ordinances § 26-119(C)(7), (D)(l)-(5)).

. Id. § 1 (to be codified at Ordinances § 26-79(D)(1)); id. § 3 (to be codified at Ordinances § 26-119(D)(1)).

. Id. § 1 (to be codified at Ordinances § 26-79(C)(7)); id. § 3 (to be codified at Ordinances § 26-119(0(7)).

. 8 U.S.C. § 1373(c).

. Ordinance 2952, § 1 (to be codified at Ordinances § 26-79(D)(2), (4)); id. § 3 (to be codified at Ordinances § 26-119(D)(2), (4)).

.See id. § 1 (to be codified at Ordinances § 26-79(0(7), (D)(l)-(5)); id. § 3 (to be codified at Ordinances § 26-119(C)(7), (D)(l)-(5)).

. 8 U.S.C. §§ 1621, 1622.

. De Canas v. Bica, 424 U.S. 351, 359, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (quoting San Diego Unions v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)) (alterations in original).

. Ante at 532-34.

. Ordinance 2952, § 1 (to be codified at Ordinances § 26 — 79(D)(3)); id. § 3 (to be codified at Ordinances § 26-119(D)(3)).

. Id. § 1 (to be codified at Ordinances § 26-79(D)(3)); id. § 3 (to be codified at Ordinances § 26-119(D)(3)).

. See Tex.Code Crim. P. art. 14.01, 14.06, 15.17.

. Arizona v. United States,-U.S. ——, 132 S.Ct. 2492, 2505, 183 L.Ed.2d 351 (2012).

. Ordinance 2952, § 1 (to be codified at Ordinances § 26-79(E)(3)); id. § 3 (to be codified at Ordinances § 26-119(E)(3)).

. Id. § 1 (to be codified at Ordinances § 26-79(E)(4)); id. § 3 (to be codified at Ordinances § 26-119(E)(4)).

. See, e.g., Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954) ("[T]hat the formulation of ... policies [regarding the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government.”); Truax v. Raich, 239 U.S. 33, 42, 36 S.Ct. 7, 60 L.Ed. 131 (1915) ("The authority to control immigration — to admit or exclude aliens — is vested solely in the Federal government.” (quoting Fong Yue Ting v. United States, 149 U.S. 698, 713, 13 S.Ct. 1016, 37 L.Ed. 905 (1893))).

. Ordinance 2952, § 1 (to be codified at Ordinances § 26 — 79(E)(4)); id. § 3 (to be codified at Ordinances § 26-119(E)(4)).

. Id. § 1 (to be codified at Ordinances § 26-79(E)(5)); id. § 3 (to be codified at Ordinances § 26-119(E)(5)).

. Id. § 1 (to be codified at Ordinances § 26-79(E)(5)); id. § 3 (to be codified at Ordinances § 26-119(E)(5)).

. Id. § 1 (to be codified at Ordinances § 26-79(E)(5)); id. § 3 (to be codified at Ordinances § 26-119(E)(5)).

. Ordinance 2952, § 6.

. See, e.g., Quick v. City of Austin, 7 S.W.3d 109, 115 (Tex.1998); Comm'n for Lawyer Discipline v. Benton, 980 S.W.2d 425, 441 (Tex.1998).